UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

| | |
|---|---|
| CHRISTOPHER J. SHROVE, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>COMMISSIONER OF SOCIAL )<br>SECURITY, suing Jo Anne B. Barnhart, )<br>)<br>Defendant. ) | Case No. 06-2100 |

# REPORT AND RECOMMENDATION

December 2005, Administrative Law Judge Richard Boyle (hereinafter "ALJ") denied social security benefits to Plaintiff Christopher Shrove. The ALJ based his decision on a finding that Plaintiff was able to perform his past relevant work as a janitor.

In May 2006, Plaintiff filed a complaint against Defendant Jo Anne Barnhart,[1] the Commissioner of Social Security, seeking judicial review of the ALJ's decision to deny his application for social security benefits. In October 2006, Plaintiff filed a Motion for Summary Judgment (#7), and in November 2006, Defendant filed a Motion for an Order which Affirms the Commissioner's Decision (#9). After reviewing the administrative record and the parties' memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1) that Plaintiff's Motion for Summary Judgment **(#7)** be **GRANTED**.

## I. Background
### A. Procedural Background

Plaintiff filed an application for social security benefits in November 2002, alleging that he became disabled in October 2002 (subsequently amended to November 2003) due to his learning disabilities and vision problems. The Social Security Administration (hereinafter

---

[1] Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, we have substituted Michael Astrue for Jo Anne Barnhart as the defendant in this suit. FED. R. CIV. P. 25(d)(1).

"SSA") denied Plaintiff's application in February 2003 and upon consideration in April 2003. Plaintiff timely requested a hearing, which the ALJ held in November 2004. At the hearing, Plaintiff and vocational expert Michelle Peters testified. Plaintiff was represented by counsel at the hearing. In December 2005, the ALJ denied benefits to Plaintiff. In March 2006, the Appeals Council denied Plaintiff's request for review of this decision. In May 2006, Plaintiff appealed this decision by filing this case in federal court.

### B.  Plaintiff's Medical Background

Plaintiff was twenty-nine years old on his amended alleged onset date of November 2003, and thirty-one at the time of the ALJ's decision. He took special education classes throughout high school and received a diploma. He has worked as a pest control helper, security guard, material handler, and janitor.

In September 1992, Plaintiff was evaluated at Palos Neuropsychiatric Institute for assessment of learning disabilities and/or cerebral dysfunction. (R. 113-18.) According to the examining neuropsychologist, testing showed cerebral dysfunction characterized by an attention deficit disorder; learning disabilities in language arts and mathematics; and depression, both organic and reactive, with personality features of obsessive compulsive and borderline components. (R. 117.) EEG testing was normal. (R. 117.) Plaintiff was treated on an inpatient basis and responded well to Ritalin. (R. 117.)

In 1995, Erwin J. Baukus, Ph.D., performed psychiatric testing which showed that Plaintiff had a verbal IQ of 75, a performance IQ of 72, and a full scale IQ of 73. (R. 120.) Dr. Baukus opined that Plaintiff functioned at a level of borderline intelligence. (R. 125.) Dr. Baukus further opined that Plaintiff's educational/vocational history and achievements were consistent with the performance of unskilled work with low reading demands, such as the work Plaintiff had been performing at that time. (R. 125.) Plaintiff's prognosis was fair to good, and Dr. Baukus recommended psychotherapy. (R. 126.)

In September 2001, Derrald G. Taylor, O.D., examined Plaintiff and diagnosed keratoconus, a disorder that results in thinning of the cornea. (R. 127.) Dr. Taylor recommended glasses that would give Plaintiff 20/25 vision in the right eye. (R. 127.) He noted that, due to Plaintiff's degenerative condition, successive corrections in glasses would be needed and, possibly, a future corneal transplant.

In January 2003, Dr. Baukus conducted a psychological examination of Plaintiff. (R. 128-32.) Plaintiff spoke in variable phrases and simple sentences, and his articulation was good. (R. 129.) His grammar, syntax, and vocabulary were weak. (R. 129.) Dr. Baukus reported that, except for counseling with Dr. Baukus from 1996 to 1998, Plaintiff had not seen a psychiatrist, psychologist, or other mental health professional for mental health treatment. (R. 129.) Plaintiff was able to perform daily activities, such as caring for his personal needs, driving, walking around the neighborhood, doing chores around the house, and going to the grocery store. (R. 130.) Plaintiff spent time searching for a job on the computer, watching television, listening to music, assembling model cars, and bowling. (R. 130.) Dr. Baukus diagnosed no psychiatric complaint, but noted a continuing learning disorder. (R. 132.)

In January 2003, Sriram Sonty, M.D., conducted an ophthalmologic examination of Plaintiff. (R. 133.) Plaintiff complained of poor vision in both eyes. (R. 133.) Plaintiff's best corrected vision was 20/50 in the right eye, and 20/400 in the left eye. (R. 133.) Dr. Sonty diagnosed keratoconus and amblyopia (lazy eye) and opined that Plaintiff could not perform tasks which required good binocular vision. (R. 134.)

In January 2003, Patricia Beers, Ph.D., a state agency psychologist, reviewed the medical evidence of record and opined that Plaintiff did not have a severe mental impairment. (R. 137-50.) On April 9, 2003, Phyllis Brister, Ph.D., another state agency psychologist, reviewed the medical evidence and agreed with Dr. Beers' assessment. (R. 137.)

In January 2003, James Graham, M.D., a state agency physician, reviewed the medical evidence of record and opined that Plaintiff did not have any exertional limitations as a result of

his impairments. (R. 151-58.) However, Dr. Graham opined that Plaintiff could never climb ladders, ropes, or scaffolds, and was limited in his far acuity and field of vision. (R. 153-54.) In April 2003, Stanley A. Burris, M.D., a state agency physician, reviewed the medical evidence and agreed with Dr. Graham's assessment. (R. 158.)

In November 2005, Matthew Nicholson, D.O., noted Plaintiff's keratoconus had worsened, with best corrected vision of 20/30 in his right eye and 20/200 in the left eye. (R. 159.) He also reported an inability to fit a contact due to irregularity in the left cornea. (R. 159.) As of May 2005, Plaintiff had developed corneal hydrops in the right eye which caused significantly blurred and often foggy vision. (R. 184.) Dr. Nicholson noted that this condition may result in scarring or permanently reduced visual acuity. (R. 184). He stated that a corneal transplant may be necessary. (R. 159.)

### C. The Hearing Before the ALJ

The ALJ held a hearing in October 2004, during which the claimant and a vocational expert, Michelle Peters (hereinafter "VE"), testified.

Plaintiff testified that he can drive when his eye is not bothering him and is able to drive at least two times a week. His vision has been blurry since he was twenty years old. He will have to have surgery for corneal transplants on both eyes. He helps around the house by mowing the grass, doing dishes, and performing other inside work. Up until a year before the hearing, he could wear a contact in his right eye and could see pretty well with the contact. About two months before the hearing (around August or September 2004), he scratched his eye and has not been able to wear the contact since then. The doctor has told him it is getting better but he cannot use the contact at this point and does not know when he will be able to do so.

The ALJ then called the VE to the stand, and asked her to consider a hypothetical person of similar age, education, and work experience as Plaintiff, with a residual function capacity (hereinafter "RFC") for work at all exertional levels, including the following restrictions: no climbing ladders, ropes, or scaffolds, avoid exposure to hazards (such as unprotected heights and

dangerous machinery), and no work requiring binocular vision.  The VE testified that such a person would be capable of performing Plaintiff's past relevant janitorial work.  The VE testified that, even if he had no distance vision, such a person would be capable of doing claimant's past janitorial work.  However, the VE testified that if such a person also had significantly blurred or foggy vision, then that person could do no jobs that exist in the economy.  The VE also testified that there was no difference between the occupational evidence that she gave and the information found in the Dictionary of Occupational Titles.

### D.  The ALJ's Decision

To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis.  20 C.F.R. § 416.920(a-f).  At each step, if the claimant is affirmatively found disabled or not disabled, the inquiry ends; but if no determination can be made, the Commissioner proceeds to the next step.  20 C.F.R. § 416.920(a)(4).  If the claimant is currently employed (or was during the relevant period), he is not disabled.  20 C.F.R. § 416.920(a)(4)(i).  The second question is whether the claimant has a severe medical impairment that will last at least twelve months.  20 C.F.R. § 416.920(a)(4)(ii).  If the claimant does not have a severe impairment, the inquiry ends.  Id.  However, if the claimant has a severe impairment, the third step is to ask whether the severe impairment meets or equals one listed in Appendix 1 to subpart P of part 404 of Chapter 20.  20 C.F.R. § 416.920(a)(4)(iii).  If it does, the claimant is disabled.  Id.  If it does not, the fourth question is whether claimant is able to perform his past relevant work with his current impairment. 20 C.F.R. § 416.920(a)(4)(iv).  If he can, then he is not disabled.  Id.  If he is not able to perform his past work, the fifth and final question is whether, with his current limitations, he can make a transition to other work which exists in significant numbers in the national economy.  20 C.F.R. § 419.960(c)(1).

The ALJ found that the claimant had not engaged in substantial gainful activity since the onset of his alleged disability.  He found that claimant had severe impairments including borderline intellectual functioning and keratoconus, an eye condition that results in thinning and bulging of the corneal tissue of the eye, causing distortion and blurring vision.  However, he

found that these impairments did not meet or medically equal one of the listed impairments in Appendix 1 of Subpart P of Regulation No. 4. He noted that Plaintiff had the RFC to work at all exertional levels, with functional restrictions as noted above, including no work requiring binocular vision. Finally, he found that Plaintiff's allegations about his limitations were not fully credible. (R. 18.)

Based on the medical record and the hearing testimony, the ALJ concluded that Plaintiff had the RFC to perform his past work as a janitor. Thus, he was not disabled. (R. 18.)

## II. Standard of Review

The ALJ's decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consol. Edison Co. v. New York,* 305 U.S. 197 (1938).) Where conflicting evidence may allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for making that determination rests with the ALJ. *Brooks v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). Therefore, the question for review is not whether the claimant is disabled, but whether substantial evidence in the record supports the ALJ's finding of no disability. *Id*. The Court defers to the ALJ's determinations of credibility, "so long as they find some support in the record." *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993).

## III. Discussion

Plaintiff's motion asks the Court to reverse the Commissioner's final decision and award benefits or, alternatively, remand for further administrative proceedings. He raises two arguments: (1) the ALJ erred by determining that Plaintiff's only visual limitation was no binocular vision; and (2) the ALJ failed to follow the mandatory method for evaluating a mental impairment pursuant to 42 U.S.C. § 405(g) and 20 C.F.R. § 404.1520a.

## A. Plaintiff's Vision

Plaintiff first argues that the ALJ erred when he concluded that Plaintiff's vision was not blurred or foggy.

Dr. Nicholson wrote two letters (January 2005 and November 2005) regarding Plaintiff's conditions, stating as follows:

> Christopher Shrove suffers from a condition called keratoconus. Keratoconus is a non-inflammatory eye condition in which the normally round dome-shaped cornea progressively thins causing a cone-like bulge to develop. This results in significant visual impairment . . . .
>
> In its earliest stages, keratoconus causes slight blurring and distortion of vision and increased sensitivity to glare and light. These symptoms usually first appear in the late teens and early twenties. Keratoconus may progress for 10-20 years and then slow in its progression. Each eye may be affected differently.
>
> Eyeglasses or soft contact lenses may be used to correct the mild nearsightedness and astigmatism that is caused in the early stages of keratoconus. As the disorder progresses and the cornea continues to thin and change shape, rigid gas permeable contact lenses can be prescribed to correct vision more adequately . . . . Christopher's best spectacle corrected acuity is 20/30 in his right eye and 20/400 in his left eye. Contact lenses may improve the vision in his right eye slightly, however his left cornea has become scarred from the disease.
>
> In severe cases, a corneal transplant may be needed due to scarring, extreme thinning or contact lens intolerance . . . . A transplant may allow better vision to be restored to Christopher's left eye.

Nicholson letter dated January 28, 2005 (R. 160).

> Chris suffers from a condition known as keratoconus. His vision uncorrected is 20/100 in the right eye and 20/200 in the left eye. With best spectacle correction Chris's vision improves to 20/40 in the right and no improvement in the left. By use of rigid gas-permeable contacts vision is 20/30 in the right, however, the left eye was not able to be successfully fit. Due to the irregularity in Chris's left cornea, a corneal transplant would be the best chance of improving vision.
>
> Keratoconus is a condition that results in the thinning and consequent bulging of the corneal tissue of the eye. This eventually causes great distortion and blur to vision. Currently, as of May 17, 2005, Chris has developed acute corneal hydrops to the right eye. Acute corneal hydrops is commonly associated

>with advanced keratoconus. It occurs when a layer within cornea, known as Descemet's membrane, ruptures. The cornea becomes swollen, causing significantly blurred, and often foggy vision. The condition may result in scarring and permanently decreased visual acuity. Corneal transplantation (penetrating keratoplasty), may be necessary to restore vision.

Nicholson letter dated November 1, 2005 (R. 159).

Speaking generally about keratoconus, Dr. Nicholson makes two statements about blurred vision: (1) "In its earliest stages, keratoconus causes slight blurring and distortion of vision" (R. 160); and (2) "Keratoconus is a condition that results in the thinning and consequent bulging of the corneal tissue of the eye. This eventually causes great distortion and blur to vision." (R. 159.) Specifically addressing Plaintiff's condition, in January 2005, Dr. Nicholson stated that Plaintiff's right eye vision may be correctable by using a contact lens. In November 2005, Dr. Nicholson stated that as of May 2005, Plaintiff's right eye had developed acute corneal hydrops, a condition commonly associated with advanced keratoconus that causes "significantly blurred, and often foggy vision." (R. 159.)

The ALJ apparently relied on the Physical Residual Functional Capacity Assessment completed by the Agency's medical consultants. (R. 151-58.) Agency doctors completed and reviewed the assessment in January 2003, indicating that Plaintiff's corrected vision in his right eye is 20/50 and in his left eye is 20/400. This assessment is out-of-date, given Dr. Nicholson's more recent evaluations of Plaintiff's condition in January and November 2005, particularly in light of the fact that Dr. Nicholson reported deterioration in the condition of Plaintiff's eyes. The ALJ did not discuss any other medical opinions that contradicted Dr. Nicholson's opinion.

It is undisputed that Plaintiff has advanced keratoconus and that he is essentially blind in his left eye. (R. 16.) Nevertheless, the ALJ concluded that Plaintiff's vision was not blurred or foggy. Based on the information in Dr. Nicholson's letters, the Court agrees with Plaintiff that this conclusion is not supported by the record. Dr. Nicholson's reports state that advanced keratoconus is characterized by significant blurring and he opines that Plaintiff has acute corneal hydrops, which is commonly associated with advanced keratoconus. He expressly states that

acute corneal hydrops causes "significantly blurred, and often foggy vision." (R. 159.) The conclusion that Plaintiff has blurred vision is inescapable.

The VE testified that no jobs are available in the national economy that a person could perform if he had Plaintiff's characteristics and also had significantly blurred or foggy vision. Defendant points out that there is no evidence in the record regarding the extent of Plaintiff's blurry vision so as to preclude all work, nor is it clear whether these symptoms had lasted, or were expected to last twelve months. Accordingly, the Court recommends reversing the Commissioner's decision and remanding the case for further consideration. In light of Dr. Nicholson's statement that corneal transplants may restore Plaintiff's vision, that reconsideration should particularly address the issues of whether Plaintiff's blurry vision is constant and whether it has lasted or is expected to last twelve months.

### B. The ALJ's Evaluation of Plaintiff's Mental Impairment

Plaintiff also argues that the ALJ failed to follow the mandatory method for evaluating a mental impairment pursuant to 42 U.S.C. § 405(g) and 20 C.F.R. § 404.1520a because the ALJ failed to make findings regarding B-criteria from Listing 12.00. The pertinent regulation states that the ALJ "must follow a special technique" to evaluate a claimant who has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(a). That includes rating the degree of limitation in the functional areas of (1) activities of daily living, (2) social functioning, and (3) concentration, persistence, or pace. 20 C.F.R. § 404.1520a(c)(4).

Defendant contends that the ALJ adequately accounted for Plaintiff's borderline intelligence in light of the fact that Plaintiff has not shown any evidence that a reconsideration or more detailed analysis of the B-criteria would lead to a different result. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Defendant contends that the ALJ's conclusion that

Plaintiff had the mental capacity to perform the work he had previously performed was consistent with reports by the state agency physicians who opined that Plaintiff's borderline intelligence did not result in any limitations in the B-criteria.

The Court has recommended that this case be remanded for reconsideration. On remand, the ALJ is directed to follow the procedures described in the Regulations for evaluating a mental impairment.

### IV.  Summary

For the reasons set forth above, this Court recommends that Plaintiff's Motion for Summary Judgment **(#7)** be **GRANTED** and that this case be remanded to the ALJ for further consideration consistent with this recommendation. Remand pursuant to 42 U.S.C. § 405(g), Sentence 4, will terminates the case. *Shalala v. Schaefer*, 509 U.S. 292, 299 (1993).

ENTER this 17th day of April, 2007.

                                    s/ DAVID G. BERNTHAL
                                    U.S. MAGISTRATE JUDGE